UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS CATERING, INC., ET AL.　　　　　　CIVIL ACTION

v.　　　　　　　　　　　　　　　　　　　　　　　　　　NO. 20-3020

LATOYA CANTRELL in her official　　　　　　　SECTION "F"
capacity as MAYOR OF THE CITY
OF NEW ORLEANS

ORDER AND REASONS

In a time unlike any other in living memory, few issues are more vexatious than balancing the conflicting needs to limit the physical toll of the COVID-19 pandemic and the economic and human tolls of our collective response to it.  This case embodies that dichotomy as well as any.  As his catering business crumbles under the weight of some of the nation's strictest indoor-gathering limits, Terry Sistrunk asks this Court to enjoin the New Orleans Mayor's enforcement of policies that she and her team of experts have designed to save lives.

Before the Court is Sistrunk's (and his company's) amended motion to enjoin[1] the Mayor from enforcing the City's indoor-

---

[1]　On November 6, 2020, the Court gave "clear and unambiguous notice" of its intent to consolidate the plaintiffs' requests for preliminary and permanent injunctive relief into a single hearing. See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981); see also FED. R. CIV. P. 65(a)(2).

gathering restrictions against the plaintiffs.  For the reasons
that follow, the motion is DENIED.

## Background

By now, any reader of this opinion is surely familiar with
the COVID-19 virus and the global pandemic its rapid human-to-
human spread has ignited.  The virus – which has severely disrupted
the lives of all Americans for almost a year now - and executive
proclamations designed to control its spread are now ubiquitous
facts of life.  That much is straightforward.  But like the virus
itself, the facts and law pertaining to this case have been moving
targets.  What follows is a summary of the most current and
pertinent facts on which this Order relies.[2]

### *The Pandemic Begins and the Mayor Takes Action*

On March 11, 2020, the World Health Organization declared the
COVID-19 outbreak a pandemic and the Mayor of New Orleans, LaToya
Cantrell, promptly declared a state of emergency.  On March 16,
2020, she issued her first set of proclamations to "slow the
spread."[3]  Unfortunately, these rules did not end the pandemic,

---

[2]   The Court draws the facts from the allegations in the
pleadings, the parties' filings, the hearing on this motion, and
judicial notice.  The Court may judicially notice matters of public
record and other facts not subject to reasonable dispute.  See
United States *ex rel.* Willard v. Humana Health Plan of Tex. Inc.,
336 F.3d 375, 379 (5th Cir. 2003).

[3]   Across the country, these rules have become as ubiquitous as
the virus itself.  For that reason, the plaintiffs could be excused
for wondering when they will ever be allowed to earnestly resume

which burns on today in spite of the approval of multiple vaccines
and more than a year of intense public and private effort.  The
physical price of the virus has been tragic and immense: as of the
date of this Order, the disease has claimed 500,000 American lives,
and New Orleans has fared particularly poorly.[4]

As weeks became months, and months bordered on years, the
Mayor adapted her pandemic policies to changing numbers and
knowledge.  In accordance with data and expert guidance, the Mayor
eased restrictions as numbers decreased and tightened restrictions
as the virus resurged.

The same went for the Mayor's limitations on indoor
gatherings, which are directly at issue in this case.  They ebbed
and they flowed, and one edict followed another.  For that reason,
a recital of each "Phase," percentage, and order in the City's
reopening scheme is unnecessary; the plaintiffs challenge only the
Mayor's restriction of indoor gatherings, and the capacity limits
pronounced in her February 25, 2021 "Modified Phase Two" guidelines
now control.  Those guidelines permit no more than 75 persons to
gather indoors and 150 persons to gather outdoors.

---

their business in New Orleans.  See S. Bay United Pentecostal
Church v. Newsom, 141 S. Ct. 716, 720 (2021) (statement of Gorsuch,
J.) ("Government actors have been moving the goalposts on pandemic-
related sacrifices for months, adopting new benchmarks that always
seem to put restoration of liberty just around the corner.").

[4]    In the early days of the pandemic, New Orleans famously joined
New York City among America's predominant "hotspots."

### *This Litigation*

The plaintiffs – a New Orleans–based catering company and its proprietor – are understandably aggrieved by these restrictions, which preclude them from operating profitably within the city limits of one of the friendliest tourist, conference, and wedding destinations in the world[5] - and have largely done so for the better part of a year.

On November 6, 2020, they sued the Mayor in this Court and sought a temporary restraining order barring her from enforcing the City's indoor-gathering limits against them.  On the same day, the Court denied the plaintiffs' motion for a temporary restraining order, because the status quo (allowing the challenged restrictions to remain undisturbed) favored the Mayor.

On November 9, 2020, the plaintiffs amended their complaint. Their amended complaint fully reasserted the allegations in their original complaint and added a paragraph to account for the Mayor's decision to increase the City's indoor-gathering limit from 50 to 100 persons just days after the plaintiffs brought suit.  In the plaintiffs' view, that new restriction was no more "rational or reasonable" than the Mayor's prior decree, as it was "still not tied to the venue's capacity" and was "still 250% more restrictive

---

[5]     The Mayor cites this fact as a reason for taking even greater precaution in New Orleans.  See Def.'s Suppl. Mem. at 2 (observing "the possibility that tourists may bring other [COVID-19] variants into the area").

than the State's capacity limit of 250 people." <u>See</u> First Am. & Suppl. Compl. at 2-3.

As the Mayor and the Governor continued to revise the indoor-gathering limits applicable to New Orleans,[6] the plaintiffs' core contentions remained the same.  The plaintiffs first contend, correctly, that the State police power enjoyed by the Mayor is not plenary and must be exercised within constitutional bounds.  From this unquestionable starting point, they argue – in essence, and more debatably - that the Mayor's indoor-gathering restrictions simply "make no sense."  <u>See</u> Compl., ¶ 16.

The plaintiffs' gripes with the Mayor's indoor-gathering policy are many in number, but essentially reducible to the following three arguments: first, that the Mayor's hard limit on indoor head count is irrational because it is not tied to a venue's size (i.e., that 75 people gathering in a dining room is much different than 75 people gathering in the Superdome for social distancing purposes); second, that the Mayor's selection of round head-count figures (such as 10, 50, or 100) is similarly irrational and not tied to any reasonable scientific proxy (like a *percentage* of capacity might be); and finally, that the Mayor's decision *not* to set a hard capacity limit for *other* indoor businesses

---

[6]     The statewide indoor-gathering limits imposed by the Governor have been more restrictive than those imposed by the Mayor at various points in the history of this case.

(including, according to the plaintiffs, "beauty salons, barbershops, nail salons, libraries, museums, zoos, aquariums, office buildings, businesses, restaurants, shopping malls, [] retail stores, and even tattoo, massage, or esthetician services") violates the plaintiffs' Fourteenth Amendment right to equal protection by treating similarly situated indoor-operating businesses differently without a valid basis for doing so.

As immediately applicable on the present motion, the plaintiffs assert that the Mayor's indoor-gathering restrictions violate their Fourteenth Amendment rights to equal protection and substantive due process.[7]  The Mayor defends the policy at issue as a valid exercise of the emergency powers afforded to her by Louisiana law and the general police power she enjoys as a municipal executive.[8]  As the Mayor notes, included in that power

---

[7]    The plaintiffs also assert federal procedural due process and takings claims, and Louisiana state constitutional claims, but neither such claim is germane to the present motion for injunctive relief.  The plaintiffs' motion centers, appropriately, on their equal protection and substantive due process claims, and the Court accordingly suspends consideration of all other claims at this stage.  There are good legal reasons for doing so; indeed, a federal court may not order a state official to comply with state law (see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984)), and ordering the Mayor to meet with, notify, or consult with the plaintiffs before amending the indoor-gathering restrictions at issue would be an extreme remedy that is wholly unsupported by the plaintiffs' conclusory procedural due process claim.

[8]    The Mayor also argues that the Governor's enactment of stricter indoor-gathering limits after the plaintiffs challenged the limits *imposed by the Mayor* renders the plaintiffs' case moot.

is a general – but not unbounded[9] - authority to rationally restrict constitutional rights "as the safety of the general public may demand."  See Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 29 (1905).

The Court held an injunction hearing on February 23, 2021, and the parties offered testimony and arguments on the intertwined questions of fact and law posed by this motion.[10]

---

Not so.  Throughout the pandemic, the Mayor has routinely changed the restrictions the plaintiffs challenge at a moment's notice. For that reason, consideration of the plaintiffs' entitlement to injunctive relief "is still called for because the [plaintiffs] remain under a constant threat" that the Mayor's restriction may again become more restrictive than the Governor's. See Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 68-69 (2020) (per curiam); see also Big Tyme Invs., L.L.C. v. Edwards, 985 F.3d 456, 465 (5th Cir. 2021) (similar pandemic-related challenge was not moot where "crux" of plaintiffs' Fourteenth Amendment claim was unchanged by subsequent change in policy).   At bottom, the plaintiffs wish to test the legality of city policies that have had (and may likely have again) a dire effect on their business, and the Mayor may not moot their claims by subjecting them to a never-ending political game.

[9]   As the Supreme Court has repeatedly observed in cases involving similar COVID-19 restrictions, executive discretion in the area of public health is not unfettered, but must be rooted in "[]sufficient appreciation [and] consideration of the [multi-faceted] interests at stake," including the rights of the People to be free from constitutionally abusive policies that do not "reflect . . . expertise or discretion." See, e.g., S. Bay United Pentecostal Church, 141 S. Ct. at 716-17 (Roberts, C.J., concurring).

[10]   At the hearing, the City offered a lucid and rational explanation of the reasons for its decision to set the limits about which the plaintiffs complain.

## I. LEGAL STANDARDS

To obtain a preliminary injunction, the plaintiffs "must show (1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that the injury outweighs any harm to the other party, and (4) that granting the injunction will not disserve the public interest." Brock Servs., L.L.C. v. Rogillio, 936 F.3d 290, 296 (5th Cir. 2019). "[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 196 (5th Cir. 2003) (quoting Miss. Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985)).

The standard for obtaining a permanent injunction is "essentially the same, with the exception that the plaintiff[s] must show" actual success on the merits rather than a mere likelihood of success. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n.12 (1987).

## II. ANALYSIS

The Court now evaluates the plaintiffs' ability to meet their burden of persuasion on the foregoing elements.

### A. Success on the Merits

The first step in seeking an injunction requires the plaintiffs to show a substantial likelihood of (or actual) success

8

on the merits.  Because the plaintiffs cannot surmount this initial
hurdle, the Court need not go further in resolving their motion.[11]

  1. *Jacobson*, *Abbott*, *Big Tyme*, and *Planned Parenthood*

  At an earlier stage of the pandemic, assessing the plaintiffs'
ability to prevail on the merits would have required the Court to
apply the tidy two-step test set forth by the Fifth Circuit in *In
re* Abbott, 954 F.3d 772 (5th Cir. 2020), *vacated*, Planned
Parenthood v. Abbott, --- S. Ct. ---, 2021 WL 231539 (Jan. 25,
2021).  Applying the Supreme Court's 1905 decision in Jacobson v.
Commonwealth of Massachusetts, Abbott instructed that "when faced
with a society-threatening pandemic, a state may implement
emergency measures that curtail constitutional rights so long as
the measures have at least some 'real or substantial relation' to
the public health crisis and are not 'beyond all question, a plain,
palpable invasion of rights secured by the fundamental law.'"  Id.
at 784 (quoting Jacobson, 197 U.S. at 31).  Abbott is no longer
good law, however; on January 25, 2021, the Supreme Court vacated

---

[11] Because it need not do so to resolve the plaintiffs' motion,
the Court does not consider whether the absence of an injunction
would irreparably harm the plaintiffs, whether such harm would
outweigh any harm the Mayor and her constituents would suffer as
a result of an injunction, and whether enjoining the Mayor's
enforcement of the policy at issue would disserve the public
interest.  Besides, balancing the equities between preserving a
business's ability to exist as a going concern and a city's need
to protect itself and its citizens from a deadly virus is a
quintessential political question that is better decided in City
Hall than in federal court.

the case as moot under the <u>Munsingwear</u> doctrine.  <u>See</u> <u>Planned
Parenthood</u>, 2021 WL 231539, at *1.

That vacatur has downstream effects on the law of this circuit
which are difficult to pinpoint with any precision at this time.
As a prime example, <u>Big Tyme Investments, L.L.C. v. Edwards</u>, the
Fifth Circuit's other seminal decision in the burgeoning and fast-
developing area of COVID-related-constitutional-challenges,
relied principally – and heavily – on <u>Abbott</u> and its reading of
<u>Jacobson</u>.  <u>See</u> 985 F.3d 456, 465-68 (5th Cir. 2021).

In light of this development, the Court ordered the parties
to brief the <u>Abbott</u> vacatur's effect on this case.  In that regard,
the plaintiffs assert that "the rationale of <u>Big Tyme</u> should have
little impact [on the Court's analysis here], as [<u>Big Tyme</u>'s]
rational[e] was heavily based on the controlling case of <u>Abbott</u>
which it reference[d] over 20 times."  <u>See</u> Pls.' Suppl. Mem. at 6.
The Mayor counters by citing the <u>Big Tyme</u> panel's statement – in
<i>quotation</i> of <u>Abbott</u> – that "<u>Jacobson</u> remains good law," and urges
the Court to apply <u>Jacobson</u>'s expansive and permissive rationale
as it did several months ago in a similar case.[12]  <u>See</u> Def.'s Suppl.
Mem. at 4.[13]

---

[12]   <u>See</u> <u>4 Aces Enters., LLC v. Edwards</u>, 479 F. Supp. 3d 311 (E.D.
La. 2020).  This Court's decision in <u>4 Aces</u> was affirmed by the
Fifth Circuit in <u>Big Tyme</u>.

[13]   The Mayor's repeated quotation of lines from <u>Big Tyme</u> that
directly quoted the now-vacated <u>Abbott</u> decision is curious at best.

For present purposes, the Court agrees with the plaintiffs that Planned Parenthood casts at least some doubt on Big Tyme's endorsement of the Jacobson analysis. Accordingly, because of the questionable standing of Big Tyme's Abbott-based analysis post-Planned Parenthood, because of the increasingly significant debate as to Jacobson's value as a precedential matter,[14] and because applying traditional constitutional analysis in lieu of Jacobson-style analysis makes no practical difference in this case,[15] the

---

[14]   As Judge Willett observed in Big Tyme, "it's unclear what, if anything," Jacobson actually "add[s] to the analysis," since "applying the modern test at Jacobson step two (whether measures are 'beyond all question, in palpable conflict with the Constitution') renders superfluous Jacobson step one (whether measures 'have at least some "real or substantial relation" to the public health crisis')."  See Big Tyme, 985 F.3d at 471 (Willett, J., concurring) (quoting Abbott, 954 F.3d at 784).  The Court notes Justice Gorsuch's concern that "some [have] mistaken [the Supreme] Court's modest decision in Jacobson for a towering authority that overshadows the Constitution during a pandemic."  See Roman Cath. Diocese of Brooklyn, 141 S. Ct. at 71 (Gorsuch, J., concurring). Justice Gorsuch is correct that "Jacobson hardly supports cutting the Constitution loose during a pandemic."  Id. at 70.  Indeed, rather than supplying a one-size-fits-all test for reviewing pandemic-based enactments, Jacobson simply "applied what would become the traditional legal test associated with the right at issue."  See id.; see also Big Tyme, 985 F.3d at 470–71 (Willett, J., concurring) ("Jacobson was decided 116 years ago [and] predates modern constitutional analysis, particularly the judge-invented tiers of scrutiny that distinguish between strongly and weakly protected rights (and between protected and unprotected classes).").  As the pandemic and its attendant array of liberty restrictions become our "new normal," "normal" constitutional analysis is increasingly in order.

[15]   Indeed, as detailed below, the Mayor would prevail on the merits in either event.  See infra subsections II.A.2–3.

Court proceeds to evaluate the plaintiffs' Fourteenth Amendment claims by traditional modes of constitutional analysis.

    2.  Equal Protection

    "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982)).

    "To establish their equal protection claim, the [plaintiffs] must show that 'two or more classifications of similarly situated persons [are] treated differently'" by the Mayor's indoor-gathering limits. Big Tyme, 985 F.3d at 468 (quoting Gallegos-Hernandez v. United States, 688 F.3d 190, 195 (5th Cir. 2012) (per curiam)). "Once that threshold showing is made, the court determines the appropriate level of scrutiny for [] review. 'If neither a suspect class nor a fundamental right is implicated, the classification need only bear a rational relationship to a legitimate governmental purpose.'" Id. (quoting Butts v. Aultman, 953 F.3d 353, 358 (5th Cir. 2020)).

    Here, the plaintiffs assert that the policy at issue treats similarly situated businesses that wish to operate indoors differently by allowing some businesses to operate indoors based

on a percentage of a venue's total capacity (and thus potentially allowing them to serve far more patrons) while restricting general indoor gatherings (which the plaintiffs are in the business of catering to) to a hard head-count.  On this point, the plaintiffs are correct.  Under the Mayor's indoor-gathering policies, a large casino or restaurant may entertain dozens or hundreds of persons indoors, but an indoor wedding, conference, or birthday party (to which the plaintiffs might otherwise be able to cater) may only include up to 75 persons.

Having found a "threshold showing" of discrimination, the Court must next determine the appropriate level of scrutiny to apply.  Id.  Because no suspect classification is involved[16] and no fundamental right is implicated,[17] that level is rational basis review.  The laxest tier of constitutional scrutiny, rational basis review "is a paradigm of judicial restraint."  FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 314 (1993).  A "classification survives rational basis review 'if there is *any* reasonably conceivable state of facts that could provide a rational basis for

---

[16] The plaintiffs do not purport to be members of a "suspect class," and indeed, they bear "none of the traditional indicia of suspectness" observed by the Supreme Court.  See San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 28 (1973).

[17]  Contrary to the plaintiffs' suggestion, there is no fundamental right to operate a business under federal law.  See *infra* subsection II.A.3.

the classification.'"  Big Tyme, 985 F.3d at 469 (emphasis added)

(quoting Beach Commc'ns, 508 U.S. at 313).

        The Mayor's indoor-gathering policies clearly pass this test.

Take it from the Mayor herself:

        Despite plaintiffs' protests, not all businesses
    are alike.  There is scientific consensus that some
    businesses having low contact intensity, low numbers of
    contacts, and high ability to modify operations in ways
    that diminish the potential spread are safer to reopen
    sooner and more fully than those with high contact
    intensity, high contacts, and the inability to modify or
    mitigate operations.  At issue here are guidelines
    concerning event venues, businesses considered to have
    both high contact intensity and a high number of
    contacts.  Such venues often have large interpersonal
    gatherings among family and friends, including weddings,
    receptions, repasts, birthday parties, which hold great
    personal and societal value.  Unfortunately, attending
    events in such venues also holds an increased risk of
    disease transmission.  Often such large in-person
    gatherings present difficulties for individuals to
    remain spaced at least six feet apart.  Furthermore,
    such events often have attendees who travel from outside
    the local area.

See Opp'n at 6 (footnotes omitted).  For better or worse,[18] that

explanation plainly satisfies rational basis review.  Indeed, in

that paragraph alone, the Mayor offers no less than six rational

reasons for the City's unequal treatment of the plaintiffs.

_____

[18]    For better, the Mayor argues; for worse, argue the plaintiffs.
Either way, in all but the rarest of cases, our Constitution leaves
this type of decision to elected officials and this kind of debate
to the political process.  See, e.g., Vance v. Bradley, 440 U.S.
93, 97 (1979) ("The Constitution presumes that, absent some reason
to infer antipathy, even improvident decisions will eventually be
rectified by the democratic process and that judicial intervention
is generally unwarranted no matter how unwisely we may think a
political branch has acted." (footnote omitted)).

As a result, the plaintiffs' equal protection claim fails on the merits and provides no basis for preliminary or permanent enjoinment of the Mayor's enforcement of the indoor-gathering restrictions at issue.

### 3.   Substantive Due Process

That leaves the plaintiffs' substantive due process claim. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." See U.S. CONST. amend. XIV, § 1.   The Supreme Court has deemed this clause to have a "substantive" component,[19] which "forbids the government to infringe certain 'fundamental' liberty interests . . . unless the infringement is narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302 (1993).

The "established method of substantive-due-process analysis has two primary features." Washington v. Glucksberg, 521 U.S. 702, 720 (1997).   "The first is that the Due Process Clause protects only 'those fundamental rights and liberties which are,

---

[19]   As this Court has observed before, the "Due Process Clause is about 'process,'" so the "notion that a provision 'that guarantees only "process" before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words.'" See 4 Aces, 479 F. Supp. 3d at 325 n.12 (quoting McDonald v. City of Chicago, 561 U.S. 742, 811 (2010) (Thomas, J., concurring)).   Substantive due process remains the law, however, and the Court applies it accordingly.

objectively, deeply rooted in this Nation's history and tradition,
and implicit in the concept of ordered liberty, such that neither
liberty nor justice would exist if they were sacrificed."  4 Aces
Enters., LLC v. Edwards, 479 F. Supp. 3d 311, 325 (E.D. La. 2020)
(quoting Glucksberg, 521 U.S. at 720–21) (internal quotation marks
omitted), *aff'd sub nom.*, Big Tyme, 985 F.3d 456.  "The second is
that 'the Supreme Court requires a careful description of the
asserted fundamental liberty interest.'"  Id. (quoting Glucksberg,
521 U.S. at 721) (internal quotation marks omitted).

Measured against these exacting standards, the liberty
interests asserted by the plaintiffs are neither fundamental nor
carefully described.  Recasting the arguments described and
rejected above (in sum, that the policy at issue and the Mayor's
decisionmaking process are irrational, unfair, scientifically
baseless, and biased against the plaintiffs' business and
industry), the plaintiffs contend that the Mayor's indoor-
gathering limits infringe on their "[f]undamental" "right to
pursue a lawful occupation without undue government influence" and
their "property right" to "Profits."  See Compl., ¶ 14.

These assertions are unavailing.  For starters, the Fifth
Circuit has explicitly rejected any "notion" of a fundamental
"right to pursue a legitimate business."  See Pollard v. Cockrell,
578 F.2d 1002, 1012 (5th Cir. 1978).  And although the plaintiffs

might[20] have a protected property *interest* in their "Profits," it can hardly be said that the plaintiffs have a fundamental *right* to pursue "Profits" without government interference they would prefer to avoid.[21]  Recognizing such a "fundamental right" in this context would overturn our entire modern conception of government regulation, in which federal and state officials routinely promulgate regulations which are costly and burdensome to private "Profits" but pursue an ostensibly greater societal benefit.

Thus, by asserting affronts to nonfundamental rights "hiding in the Constitution's penumbras,"[22] the plaintiffs' substantive due

---

[20]   See 4 Aces, 479 F. Supp. 3d at 325–26 (highlighting legal uncertainty on this question).

[21]   Loss in profits suffered by the plaintiffs as a result of the Mayor's pronouncements might be examined in connection with the plaintiffs' regulatory-takings damages claim.

[22]   Under the caselaw binding on this Court, the Mayor's asserted rationale is sufficient to justify prolonged suspensions of nonfundamental rights.  That latter point (i.e., the fact that the rights at issue have no textual basis in the Constitution and are *nonfundamental* creatures of Fourteenth Amendment "substantive due process," rather than *fundamental* rights like the right to freely exercise religion at issue in South Bay and every Supreme Court "COVID case" the plaintiffs cite) is the key to this case.  Simply put, it is not for this Court to decide whether the Mayor should allow strip-club attendance while disallowing indoor gatherings of a modest size.  That decision belongs to the Mayor and the political process – within reason, which the Mayor has abundantly provided here.  We are not dealing with a ban on church gatherings, speech, or even a recognized "fundamental right" like contraception.  That fact alone distinguishes this case from South Bay, Roman Catholic, and the others.  Here, the Mayor only must show that there is any rational basis whatsoever for the policy she has adopted, which the voters can hold her accountable for by voting at the ballot box and/or with their feet.

process claim triggers mere rational-basis review.  See Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 70–71 (2020) (Gorsuch, J., concurring).  As explained above, the Mayor's rationale for the policy at issue passes this test – combative political leadership squabbles notwithstanding.

As such, the plaintiffs' substantive due process claim also fails on the merits and does not supply a basis for preliminary or permanent injunctive relief.

*     *     *

The plaintiffs' pleas for help deserve attention, respect, and sympathy, and their discomfort with the Mayor's political stewardship is understandable.  However, the Constitution "principally entrusts the safety and the health of the people to the politically accountable officials of the States."  S. Bay United Pentecostal Church v. Newsom, 141 S. Ct. 716, 717 (2021) (Roberts, C.J., concurring) (quoting S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring)).

The plaintiffs ask this Court to second-guess the nature and extent of indoor-gathering limits the Mayor has enacted to protect public health by slowing the spread of COVID-19.  Sympathy aside, the Constitution contains no right to cater an indoor gathering of sufficient size to make a profit.  Consequently, the Mayor's restriction of the plaintiffs' ability to do so – which does not

18

discriminate on the basis of any suspect classification - need only be justified by even the slightest rational basis. This is the easiest bar to clear in constitutional law, and the Mayor's edict does so here.

Accordingly, IT IS ORDERED: that the plaintiffs' amended motion for preliminary and permanent injunctive relief is DENIED.

New Orleans, Louisiana, March 2, 2021

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE